# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| **ROGER DUNHAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:12CV 21 SNLJ(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Roger Dunham for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 12). Defendant has filed a Brief in Support of the Answer. (Doc. No. 15).

## Procedural History

On March 30, 2006, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on August 20, 2004. (Tr. 80-88). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated September 30, 2008. (Tr. 46-47, 50-54, 5-

18).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council, which was denied on April 16, 2009.  (Tr. 20, 21-24).

In a Report and Recommendation dated May 6, 2010, the undersigned recommended that the decision of the Commissioner be reversed and this matter be remanded to the Commissioner for further proceedings.  (Tr. 824-47).  On June 23, 2010, the district court[1] adopted the Report and Recommendation.  (Tr. 848-49).

The Appeals Council remanded the case to an ALJ for further proceedings on July 19, 2010.  (Tr. 820-52).  On January 21, 2011, following another hearing, an ALJ found that plaintiff was not disabled.  (Tr. 755-771).  On January 24, 2012, the Appeals Council denied plaintiff's request for review.  (Tr. 729-32).  Thus, the January 21, 2011 decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    First ALJ Hearing

Plaintiff's first administrative hearing was held on August 6, 2008.  (Tr. 38).  Plaintiff was present and was represented by counsel.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that he lived with his wife and his seventeen-year-old son.  (Id.).  Plaintiff stated that he was fifty-two years of age.  (Tr. 39).  Plaintiff testified that he completed the tenth grade and did not ever try to obtain a GED.  (Id.).  Plaintiff stated that the only vocational training he has received is forty hours training in heating and air conditioning about twenty years prior to the hearing.  (Id.).  Plaintiff testified that he was

_____

[1]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri.

able to read and write.  (Id.).

Plaintiff stated that he was six feet tall and weighed 350 pounds or more.  (Id.).  Plaintiff testified that he had weighed this amount for about six years.  (Id.).

Plaintiff stated that he was not working at the time of the hearing and that he last worked in August of 2004.  (Tr. 40).  Plaintiff testified that at his last position, he worked part-time performing maintenance work at Country Hearth Inn.  (Id.).  Plaintiff stated that in the fifteen years prior to the hearing, he performed mostly labor positions.  (Id.).  Plaintiff testified that all of the positions he has had required lifting more than twenty pounds, standing, walking, bending, stooping, and digging.  (Id.).

Plaintiff testified that he is not able to work because he has arthritis in all of his joints, his shoulders are worn out, his knees are "gone," he has diabetes, he suffers from depression, he has high blood pressure, and he has cervical[2] disc disease.  (Tr. 40-41).  Plaintiff stated that he sees a family doctor, Dr. Tim McPherson; Dr. Mona Tomescu, who is at the same clinic as his family doctor; and Dr. Edmund Landry, a neurologist.  (Tr. 41).  Plaintiff testified that Dr. Landry told him that he needed back surgery due to pressure on his spine and nerve damage, but he was unable to find a surgeon to operate due to his size.  (Id.).

Plaintiff stated that, at the time of the hearing, his pain was being treated with medication.  (Id.).  Plaintiff testified that he still experiences pain when he takes his medications.  (Id.).

---

[2]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

Plaintiff stated that his pain increases with physical activity.  (Id.).  Plaintiff's attorney noted that plaintiff was carrying a cane with him at the hearing.  (Tr. 42).  Plaintiff testified that he uses the cane often, especially when he sits down and gets up.  (Id.).

Plaintiff stated that he is only able to be on his feet for five minutes before he has to take a break.  (Id.).  Plaintiff testified that, after he is on his feet for five minutes, he experiences pain in his neck, back, knees, and shoulders.  (Id.).  Plaintiff stated that on bad days, he also experiences pain in his wrist or feet.  (Id.).  Plaintiff testified that he also has difficulty sitting for long periods. (Id.).

Plaintiff's attorney asked plaintiff whether he would be able to work at a job where he was required to lift fifteen to twenty pounds regularly, for a total of two to three hours during a workday.  (Id.).  Plaintiff testified that he would not be able to work at such a job.  (Tr. 43). Plaintiff stated that if he worked a full day, he would be unable to come back the next day due to pain.  (Id.).

Plaintiff testified that on a typical day, he gets out of bed, has a cup of coffee, and then sits on the couch.  (Id.).  Plaintiff stated that he does not perform any household chores or yard work. (Id.).  Plaintiff testified that his son handles all of the chores.  (Id.).  Plaintiff stated that he only performs light activities around the house, such as helping his wife watch his grandchildren.  (Id.).

Plaintiff testified that he experiences depression.  (Id.).  Plaintiff stated that he is scheduled to see a specialist for his depression.  (Id.).  Plaintiff testified that, at the time of the hearing, he was not under the care of a psychiatrist or counselor.  (Tr. 44).  Plaintiff stated that he had been taking medication for his depression for a while.  (Id.).  Plaintiff testified that his pain is the

biggest factor that prevents him from working.  (Id.).  Plaintiff stated that if he makes a wrong

move, he is "in trouble" for a few days.  (Id.).

**B.**     **Second ALJ Hearing**

Plaintiff's second administrative hearing was held on November 2, 2010.  (Tr. 780).

Plaintiff was present and was represented.  (Id.).

Plaintiff's attorney stated that plaintiff had undergone an MRI the morning of the hearing,

and requested that the record be held open so that these records could be submitted.  (Id.).  The

ALJ indicated that he would leave the record open for thirty days.  (Tr. 781).

Plaintiff's attorney examined plaintiff, who testified that he was fifty-four years of age, and

lived with his wife and his nineteen-year-old son.  (Tr. 782).

Plaintiff stated that, at his last job, he performed maintenance work at a hotel twenty hours

a week.  (Id.).  Plaintiff testified that he left this position due to the medical problems he was

experiencing.  (Id.).

Plaintiff stated that he became unable to work on August 20, 2004, and that he has never

regained the capacity for work from that time until the time of the hearing.  (Tr. 783).

Plaintiff testified that, during the time period of August 2004 through September 2006, he

was unable to work due to a deformed foot, neck pain, and back pain.  (Id.).  Plaintiff stated that

he was receiving treatment from his family doctor and a specialist during that time.  (Id.).  Plaintiff

testified that he underwent x-rays, took medication, and used a continuous positive airway

pressure ("CPAP") machine.  (Tr. 783-84).

Plaintiff stated that he was still using the CPAP machine at the time of the hearing.  (Tr.

784).  Plaintiff testified that he was prescribed the CPAP machine because a sleep study revealed

that he woke fifty-seven times an hour. (Id.). Plaintiff stated that the CPAP machine helped his sleep somewhat, although he still experienced difficulty falling asleep. (Id.).

Plaintiff testified that, from 2004 through 2006, he did not perform many chores or engage in many hobbies. (Id.). Plaintiff stated that, on a typical day during that period, he woke up, sat on the couch, and watched television. (Tr. 785). Plaintiff testified that he was unable to perform yard work, or maintain his vehicles. (Id.). Plaintiff stated that he used to enjoy playing the guitar, and he still tries to play, but his fingers "don't work right." (Id.).

Plaintiff testified that, if he were offered a job in late 2004 where he would be on his feet for a total of four to five hours, he would have been unable to perform the position. (Id.). Plaintiff stated that his symptoms were aggravated by being on his feet for a period of time. (Id.). Plaintiff testified that he was able to be on his feet for fifteen to twenty minutes before he would have to sit down due to pain in his left foot. (Tr. 786). Plaintiff stated that, if he were offered a position at which he would sit for most of the day and use his hands to attach parts, his hands would "probably be able to do it," although he would have to lie down for periods due to neck and back pain. (Id.).

Plaintiff testified that, from 2007 through the time of the hearing, his problems have worsened. (Tr. 787). Plaintiff stated that his back impairment has worsened, and he now has pain farther down his back. (Id.).

Plaintiff testified that his medications have changed from Methadone[3] to Lorcet[4] because the Methadone was not helping his depression and it "built up" in his system. (Id.). Plaintiff stated that he has tried different pain medication throughout the years, and that the medication dulls the pain "for a little while" but it eventually wears off. (Id.). Plaintiff testified that his pain medication occasionally causes nausea. (Tr. 789).

Plaintiff testified that he started seeing Dr. Syed Nasir for pain management in 2002. (Tr. 788). Plaintiff stated that Dr. Nasir first administered shots in his neck, which did not help. (Id.). Plaintiff testified that Dr. Nasir next prescribed Methadone. (Id.).

Plaintiff stated that his sleep apnea[5] was about the same at the time of the hearing as it was when he started using the CPAP machine. (Tr. 789). Plaintiff testified that he feels "a little more rested" since he started using the CPAP machine. (Tr. 788).

When asked whether his depression interfered with his day-to-day activities, plaintiff responded, "Well, yes, to a certain extent I guess." (Tr. 789).

Plaintiff testified that he had lost thirty pounds, which did not change his condition. (Id.). Plaintiff stated that he weighed approximately 320 pounds at the time of the hearing. (Tr. 790). Plaintiff testified that he weighed more than 350 pounds for an extended period. (Id.).

---

[3]Methadone is an opioid analgesic indicated for the relief of moderate to severe pain and as part of drug addiction detoxification and maintenance programs. See Physician's Desk Reference (PDR), 3289 (63rd Ed. 2009).

[4]Lorcet is a combination of acetaminophen and hydrocodone indicated for the treatment of moderate to severe pain. See PDR at 1180.

[5]A disorder characterized by recurrent interruptions of breathing during sleep, due to temporary obstruction of the airway by lax, excessively bulky, or malformed pharyngeal tissues, with resultant hypoxemia and chronic lethargy. See Stedman's Medical Dictionary, 119 (28th Ed. 2006).

Plaintiff stated that he did not believe he could work at a position eight hours a day, five days a week on a regular, consistent basis at any time since 2004. (Id.).

Plaintiff testified that, in 2004, his only source of income was TANF, which consisted of food stamps and cash for utilities. (Id.). Plaintiff stated that, at the time of the hearing, his wife was receiving disability benefits for a mental impairment. (Id.). Plaintiff testified that he did not receive unemployment benefits or workers' compensation. (Id.).

## C.    **Relevant Medical Records**[6]

The record reveals that plaintiff received treatment at Steele Family Rural Health Clinic from April 2002 through March 2009 for various impairments, including type II diabetes mellitus,[7] GERD,[8] obesity, shoulder pain, back pain, sleep disorder, left foot pain, and depression. (Tr. 372-474, 505-08, 566-77, 618-45, 685-96, 711-16). Plaintiff was treated with medication. (Id.). Plaintiff was also consistently advised to lose weight by adhering to an 1800 calorie diet. (Id.).

On December 8, 2004, plaintiff presented to Theodore W. Duensing, D.O. with complaints of acid reflux, nausea, and vomiting. (Tr. 238). Plaintiff reported a family history of colon cancer.

---

[6]The following medical evidence was summarized in the undersigned's May 6, 2010 Report and Recommendation.

[7]Diabetes mellitus is a chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced. It is caused by an absolute or relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, water and electrolyte loss, ketoacidosis, and coma. Stedman's at 529. Type II diabetes is characterized by high blood glucose levels caused by either a lack of insulin or the body's inability to use insulin efficiently; it develops most often in middle-aged and older adults. Id. at 530.

[8]Gastroesophageal reflux disease (GERD) is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. See Stedman's at 556.

(Id.).  Dr. Duensing recommended a colonoscopy.  (Tr. 239).  Plaintiff underwent a colonoscopy on

December 16, 2004, which revealed multiple polyps[9] and diverticulosis.[10]  (Tr. 249).

On December 20, 2004, plaintiff underwent a barium enema due to complaints of abdominal

pain, which revealed diverticula.  (Tr. 224).

Plaintiff underwent a sleep study at Twin Rivers Regional Medical Center on March 1, 2005.

(Tr. 174).  Plaintiff was diagnosed with obstructive sleep apnea, which improved with use of a CPAP

machine.  (Tr. 175).  It was recommended that plaintiff use the CPAP machine nightly, lose weight,

and stop smoking.  (Id.).

Plaintiff underwent x-rays of the bilateral shoulders and cervical spine on October 27, 2005,

which revealed C6-C7 and C5-C6 ankylosis[11] with reduced joint space in the shoulder with

osteoarthritis.[12]  (Tr. 353).

Plaintiff underwent an MRI of the cervical spine on November 11, 2005, which revealed

degenerative changes of the cervical spine with moderate narrowing of the central spinal canal at C4-

C5 and moderate narrowing of the right neural foramen.  (Tr. 190).

---

[9]A general descriptive term used with reference to any mass of tissue that bulges or projects outward or upward from the normal surface level.  See Stedman's at 1537.

[10]Presence of a number of diverticula of the intestine, common in middle age.  A diverticulum is a pouch or sac opening from a tubular or saccular organ, such as the gut or bladder.  See Stedman's at 575.

[11]Stiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint.  Stedman's at 95.

[12]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints.  Stedman's at 1388.

Plaintiff presented to Syed M. Nasir, M.D. for a pain management evaluation on March 29, 2006. (Tr. 188-89). Plaintiff's gait was stiff with a slight limp. (Tr. 188). Plaintiff had limited range of motion at both shoulders and the cervical spine due to pain. (Id.). Plaintiff had good range of motion of the lumbar spine with some pain. (Id.). Plaintiff's bilateral straight leg raise was negative. (Id.). There was no tenderness of the cervical spine, shoulder, or low back. (Id.). Plaintiff had full muscle strength of the bilateral upper and lower extremities. (Id.). Dr. Nasir's assessment was: chronic mechanical cervical back pain, degenerative arthritis, chronic bilateral shoulder and knee pain, chronic bilateral foot pain, chronic low back pain, hypertension, type 2 diabetes mellitus, sleep apnea on CPAP, depression and insomnia, obesity, and pending disability claim. (Id.). Dr. Nasir started plaintiff on Lyrica[13] and continued him on Ultram.[14] (Id.).

Plaintiff saw Dr. Nasir for pain management on a monthly basis from May 2006 through October 2008, and diagnosed plaintiff with chronic mechanical cervical back pain, degenerative arthritis, chronic bilateral shoulder and knee pain, chronic bilateral foot pain, chronic low back pain, hypertension, type 2 diabetes mellitus, sleep apnea on CPAP, depression and insomnia, obesity, and myofascial pain syndrome.[15] (Tr. 525-26, 561-63, 579-606, 613-14, 665-66, 675-81). Dr. Nasir administered trigger point injections on May 8, 2006. (Tr. 616).

---

[13]Lyrica is indicated for neuropathic pain associated with diabetic neuropathy. See PDR at 2527.

[14]Ultram is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time. See PDR at 2429.

[15]Irritation of the muscles and fascia of the back and neck causing acute and chronic pain not associated with any neurologic or bony evidence of disease; presumed to arise primarily from poorly understood changes in the muscle and fascia. Stedman's at 1907.

Plaintiff presented to Dr. Duensing on May 17, 2006, to schedule a colonoscopy. (Tr. 514). Plaintiff complained of blood in his stool. (Id.). Plaintiff's post-colonoscopy diagnoses were diverticulosis coli, history of colon polyps, and inadequate bowel preparation for removal of polyps. (Tr. 513).

Plaintiff underwent a barium enema on June 14, 2006, which revealed two possible polyps and multiple diverticula. (Tr. 520).

On July 17, 2006, Dr. Nasir continued the Ultram and prescribed Flexeril.[16] (Tr. 614).

Plaintiff presented to Edmund Landry, M.D. on August 24, 2006, with complaints of neck pain with radiation into the interscapular area of the upper back, pain in the elbows and wrists, pain in the lateral and buttock area around both hips, lower back pain, and right knee pain. (Tr. 668). Plaintiff also reported that his left hand goes to sleep while driving, his great toe has been numb for years, and his right second toe is slightly numb. (Id.). Plaintiff indicated that he was no longer able to reach far enough to comb his hair or shave. (Id.). A physical examination of plaintiff's neck revealed 40 degrees flexion, 0 degrees extension, 40 degrees rotation to the right and 50 degrees rotation to the left, all accompanied by complaints of pain. (Id.). Tenderness was noted at the left paravertebral muscles. (Id.). An examination of plaintiff's back revealed no tenderness, 60 degrees flexion, and negative straight leg raising bilaterally. (Id.). Elevation of plaintiff's shoulders was limited to 90 degrees with complaints of pain. (Id.). Plaintiff's left knee was non tender, with no swelling, and slight medial laxity. (Id.). Plaintiff had decreased sensation at the right first and second toes. (Id.). Dr. Landry noted that an MRI of the cervical spine from November 2005 revealed

---

[16]Flexeril is a skeletal muscle relaxant which relieves muscle spasm of local origin without interfering with muscle function. See PDR at 966.

moderate narrowing of the cervical spinal canal at C4, C5. (Tr. 669). Dr. Landry's impression was cervical degenerative disc disease,[17] cervical spinal stenosis,[18] bilateral rotator cuff disease, lower back pain, possible torn meniscus at the left knee, and Dupuytren's disease[19] in the hands and feet. (Id.). Dr. Landry recommended a neurosurgical evaluation. He noted that he had been unable to find a neurosurgeon that would accept Medicaid after faxing plaintiff's "significant findings." (Id.).

On August 29, 2006, Dr. Nasir discontinued the Flexeril, continued the Ultram, and started plaintiff on Hydrocodone.[20] (Tr. 612). On September 28, 2006, plaintiff reported that the Hydrocodone did not last long enough and caused itching on his face. (Tr. 609). Dr. Nasir noted that plaintiff was unable to find a local neurosurgeon but was willing to go to St. Louis. (Id.). Dr. Nasir discontinued the Hydrocodone and started plaintiff on Methadone. (Tr. 610). On October 27, 2006, plaintiff reported that his pain was better after starting Methadone and that he had no side effects. (Tr. 607). Dr. Nasir continued the Methadone and Ultram. (Id.). On November 28, 2006, plaintiff reported that his pain was stable on his current medications. (Tr. 605). Dr. Nasir noted that Dr. Kenneth Smith, a neurosurgeon in St. Louis, did not believe plaintiff was a candidate for a

---

[17]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:201 (1993).

[18]Narrowing of the spinal canal. See Stedman's at 1832.

[19]A condition characterized by multiple fibromas, with relatively widespread distribution. See Stedman's at 725. A fibroma is a benign neoplasm derived from fibrous connective tissue. Id. at 724.

[20]Hydrocodone is an opioid analgesic indicated for the relief of moderate to moderately severe pain. See PDR at 3144-45.

neurosurgery consultation. (Id.). Plaintiff was continued on Methadone and Ultram. (Tr. 606). Plaintiff reported that his pain was stable on his medications on December 28, 2006. (Tr. 603). On January 25, 2007, plaintiff reported experiencing more pain than usual and felt that the Methadone was not lasting long enough. (Tr. 601). Dr. Nasir increased plaintiff's dosage of Methadone. (Tr. 602). On February 28, 2007, plaintiff reported that his pain was better after the Methadone dosage was increased. (Tr. 599). On March 30, 2007 and April 30, 2007, plaintiff reported that his pain was stable. (Tr. 597, 595). On May 30, 2007, plaintiff reported that his pain was under control most of the time but physical activity increased his pain. (Tr. 593). On June 29, 2007, plaintiff reported that the Methadone was not as effective as it previously had been. (Tr. 591). Dr. Nasir continued plaintiff on his medication regimen. (Id.). On July 25, 2007, plaintiff continued to complain that the Methadone was not as effective as it had previously been. (Tr. 589). Dr. Nasir increased plaintiff's dosage of Methadone. (Id.). On August 23, 2007, plaintiff reported that his pain was much better since the Methadone had been increased and that he was able to do more physical activities with less pain. (Tr. 587). On September 26, 2007, October 17, 2007, November 28, 2007, January 28, 2008, March 19, 2008, April 25, 2008, May 28, 2008, and June 25, 2008 plaintiff reported that his pain was stable. (Tr. 585, 583, 581, 579, 665, 681, 680, 679).

Plaintiff presented to Esteban Gambaro, M.D. on March 5, 2008 for a consultation regarding a repeat colonoscopy. (Tr. 663). Plaintiff underwent a colonoscopy on March 31, 2008, which revealed diverticulosis and a small polyp. (Tr. 647). Dr. Gambaro was unable to complete the colonoscopy due to poor bowel preparation. (Id.).

Plaintiff underwent x-rays of the knees on March 28, 2008, which revealed slight narrowing of the medial and lateral joint space of the left knee and the medial joint space of the right knee,

without significant osteophyte formation or fracture.  (Tr. 682).

On July 25, 2008, plaintiff reported to Dr. Nasir that he was having more pain since lifting his granddaughter the previous day but otherwise was doing well on his medication regimen.  (Tr. 678). On August 25, 2008, plaintiff reported that his pain was stable.  (Tr. 677).  On September 24, 2008, plaintiff reported experiencing more pain than usual due to lifting tree limbs from his yard the previous day.  (Tr. 676).  On October 21, 2008, plaintiff reported some foot pain but indicated that his medications were still helping his pain most of the time.  (Tr. 675).  Dr. Nasir indicated that the pain clinic would be closing the next month and that plaintiff should contact his primary care physician for continuation of his Methadone.  (Id.).

Plaintiff presented to Doug Foltz, DPM, on November 6, 2008, for a diabetic foot evaluation. (Tr. 702).  Plaintiff complained of numbness in his right great toe and semi-painful masses along the plantar aspects of his feet.  (Id.).  Dr. Foltz's assessment was Ledderhoses disease (multiple plantar fibromatosis) of the foot, and neuropathy[21] of the right great toe.  (Id.).  Dr. Foltz indicated that the probable cause of plaintiff's neuropathy was his diabetes, although no treatment was warranted at that time because it was not progressive.  (Id.).  Dr. Foltz recommended daily foot inspections and encouraged follow-up as needed.  (Id.).

The record reveals that plaintiff saw a psychiatrist[22] for depression on December 5, 2008, January 5, 2009, February 5, 2009, and March 10, 2009.  (Tr. 705-08).  Plaintiff was prescribed

---

[21]A classic term for any disorder affecting any segment of the nervous system.  Stedman's at 1313.

[22]The signature of the psychiatrist is illegible.

Wellbutrin,[23] Risperdal,[24] Abilify,[25] Trazodone,[26] and Geodon.[27]  (Tr. 707-08).

Plaintiff saw Dr. Landry on February 3, 2009, with complaints of bilateral knee pain.  (Tr. 726-27).  Dr. Landry noted that plaintiff walked with a limp, without an assistive device.  (Id.).  An examination of the knees revealed no joint effusion or skin rash.  (Id.).  Plaintiff's mood and affect were described as normal.  (Id.).  Dr. Landry diagnosed plaintiff with osteoarthritis of the knees.  (Tr. 727).  He administered the first of three Synvisc injections.  (Id.).

### New Medical Evidence[28]

Plaintiff saw Dr. Landry on February 17, 2009, at which time plaintiff reported that his knees felt "a little better."  (Tr. 993).  Upon examination, plaintiff's stance and posture were normal.  (Id.).  Plaintiff walked with a limp without assistive devices.  (Id.).  Plaintiff's knee examination revealed no joint effusion or skin rash.  (Id.).  Plaintiff's mental status exam revealed a normal mood and affect.  (Id.).  Dr. Landry administered a third and final Synvisc injection.  (Tr. 994).

Plaintiff saw Dr. Nasir on April 20, 2009, at which time plaintiff reported that the pain

---

[23]Wellbutrin is indicated for the treatment of major depressive disorder.  See PDR at 1649.

[24]Risperdal is a psychotropic drug indicated for the treatment of schizophrenia.  See PDR at 1754.

[25]Abilify is an antipsychotic drug indicated for the treatment of schizophrenia, bipolar disorder, and major depressive disorder.  See PDR at 881.

[26]Trazodone is an antidepressant indicated for the treatment of depression and anxiety disorders.  See PDR at 3296.

[27]Geodon is an antipsychotic drug indicated for the treatment of schizophrenia and bipolar mania.  See PDR at 2521.

[28]The following more recent medical evidence was not summarized in the May 16, 2010 Report and Recommendation.

medication he was getting from his primary care physician was "still helping him." (Tr. 1026). Plaintiff's gait and balance were normal, and no new findings were noted on physical exam. (Id.). Dr. Nasir continued plaintiff's Methadone and Ultram, and indicated that plaintiff would return the following month for medication refills. (Id.).

On May 18, 2009, plaintiff reported that his pain medications were still helping his pain. (Tr. 1025). Plaintiff's physical exam remained unchanged. (Id.). Dr. Nasir continued plaintiff's medications. (Id.).

Plaintiff underwent nerve conduction testing on September 9, 2009, which revealed electrophysiologic evidence of moderate carpal tunnel syndrome[29] on the left and mild on the right, but no evidence of cervical radiculopathy[30] on the left. (Tr. 950).

Plaintiff saw Mona Tomescu, M.D. at Steele Family Rural Health Clinic, LLC, on July 8, 2010, for medication refills. (Tr. 1000). Dr. Tomescu diagnosed plaintiff with diabetes mellitus, back pain, bilateral knee osteoarthritis, and obesity. (Tr. 1001). Dr. Tomescu refilled plaintiff's Ultram, and started him on Lorcet. (Id.).

Plaintiff presented to Dr. Nasir on July 20, 2010, for a follow-up visit at the request of his family care physician. (Tr. 1023). Plaintiff indicated that his primary care physician prescribed Hydrocodone, which he took twice a day. (Id.). Plaintiff reported that the Hydrocodone helps him, but does not last more than eight hours. (Id.). Plaintiff indicated that he had been diagnosed with bilateral carpal tunnel pain, although his neck and low back pain were his biggest complaints. (Id.).

---

[29]The most common nerve entrapment syndrome characterized by paresthesias, typically nocturnal, and sometimes sensory loss and wasting in the median nerve distribution in the hand. Stedman's at 1892.

[30]Disorder of the spinal nerve roots. Stedman's at 1622.

Dr. Nasir noted that plaintiff wore wrist splints. (Id.). Upon examination, plaintiff had limited range of motion at the lumbar spine and cervical spine due to pain and obesity. (Id.). Dr. Nasir increased plaintiff's dosage of Hydrocodone. (Tr. 1024).

Plaintiff presented to Dr. Tomescu on August 5, 2010, at which time plaintiff reported that his mid thoracic pain was getting worse. (Tr. 1003). Plaintiff rated his mid-back pain as a ten on a scale of one to ten. (Id.). Upon examination, Dr. Tomescu noted that no overt pathology was recognized. (Tr. 1004). Dr. Tomescu added a muscle relaxant to plaintiff's prescription regimen, and recommended a podiatry consult. (Id.).

Plaintiff presented to Dr. Nasir on August 18, 2010, for follow-up of his chronic cervical back, bilateral shoulder, low back, bilateral feet, and knee pain. (Tr. 1022). Plaintiff reported that his pain medications were helping his pain well. (Id.). Upon physical examination, plaintiff's gait and balance were normal. (Id.). Dr. Nasir continued plaintiff's Hydrocodone and Ultram. (Id.).

Plaintiff presented to Dr. Foltz on August 19, 2010, with complaints of left foot pain. (Tr. 1011). Plaintiff indicated that he injured his left foot in high school playing football, and had experienced on and off pain since that time, although it had become more constant in recent months. (Id.). Plaintiff's pain was worse with ambulation, and better with rest. (Id.). Upon examination, there was pain to palpation along the fifth metatarsal base of the left foot with no edema. (Id.). Dr. Foltz stated that x-rays revealed what appeared to be a large, sub-acute avulsion fracture off of the base of the fifth metatarsal with no acute fractures noted. (Tr. 1012). Dr. Foltz diagnosed plaintiff with previous left fifth metatarsal avulsion fracture, sub-acute, with bursitis;[31] and type 2 diabetes.

---

[31]Inflammation of a bursa, which is a fluid-filled sack which lies between a tendon and bone. See Stedman's at 282.

(Id.). He recommended conservative treatment, including utilizing heat and ice at home. (Id.). Dr. Foltz administered a steroid injection. (Id.).

Plaintiff presented to Dr. Tomescu on September 2, 2010, at which time plaintiff reported that his back pain and neck pain were worse. (Tr. 1006). Dr. Tomescu did not examine plaintiff's back. (Tr. 1007).

Plaintiff saw Dr. Foltz for follow-up on September 9, 2010, at which time plaintiff reported feeling significantly better, although he still had occasional discomfort. (Tr. 1010). Upon examination, Dr. Foltz noted mild pain to deep palpation along the fifth metatarsal base of the left foot, with normal strength and range of motion. (Id.). Dr. Foltz diagnosed plaintiff with resolving bursitis, left foot; and type 2 diabetes. (Id.).

Plaintiff presented to Dr. Nasir on September 22, 2010, at which time he reported that his pain medications were helping his pain most of the time. (Tr. 1021). Upon examination, plaintiff's gait and balance were normal. (Id.). Dr. Nasir continued plaintiff's medications. (Id.). On October 20, 2010, plaintiff again reported that his pain medications were helping most of the time. (Tr. 1020). Plaintiff's physical examination was unchanged. (Id.). Dr. Nasir continued plaintiff's medications. (Id.).

Plaintiff presented to neurosurgeon Brandon Scott, D.O., on October 15, 2010, with complaints of neck pain since 1998. (Tr. 1030). Plaintiff also reported experiencing a sensation of bugs crawling down his left arm down to his wrist. (Id.). Plaintiff indicated that he had tried pain management without any relief, and that his pain had worsened in the past year. (Id.). Upon physical examination, plaintiff had full motor strength throughout the bilateral upper and lower extremities and ambulated well. (Id.). Plaintiff's sensation was intact, and his reflexes were normal in the bilateral

upper and lower extremities. (Tr. 1031). Plaintiff's mental status examination revealed an intact recent and remote memory, intact attention, fluent speech, and a good fund of knowledge. (Id.). Dr. Scott stated that plaintiff's exam was "within normal limits." (Id.). Dr. Scott diagnosed plaintiff with cervical pain. (Id.). He noted that plaintiff's MRI of the cervical spine was over one year old, and that plaintiff reported his symptoms had worsened. (Id.). Dr. Scott scheduled an MRI of the cervical spine. (Id.).

Plaintiff saw Dr. Scott on November 9, 2010, at which time Dr. Scott indicated that an MRI of the cervical spine showed multilevel degenerative disc disease with disc herniations and foraminal stenosis at multiple levels. (Tr. 1032). Dr. Scott stated that plaintiff was not a surgical candidate, as his "disease process [was] advanced to the point where [] the surgery will not benefit him." (Id.). Dr. Scott indicated that plaintiff could continue with pain management, and that no follow-up was needed. (Id.).

Dr. Tomescu completed a Medical Source Statement Physical on November 22, 2010. (Tr. 1036-37). Dr. Tomescu expressed the opinion that plaintiff could occasionally lift and carry less than ten pounds; stand or walk for less than one hour; sit for less than one hour; and was unable to push or pull repetitively, due to diabetic neuropathy, carpal tunnel syndrome, severe cervical radiculopathy, severe L5 spine radiculopathy, and COPD[32]/heart disease. (Tr. 1036). Dr. Tomescu also found that plaintiff could never balance, stoop, kneel, or crouch; and could only occasionally climb, bend, reach, handle, finger, feel, and see. (Tr. 1037).

---

[32]Chronic obstructive pulmonary disease ("COPD") is a general term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied. Stedman's at 554.

Dr. Nasir completed a Medical Source Statement Physical on November 25, 2010, in which he expressed the opinion that plaintiff could frequently lift and carry less than ten pounds, and occasionally lift and carry ten pounds; stand or walk for a total of two to three hours in an eight-hour workday, and stand or walk continuously for zero hours; sit for a total of three to four hours in an eight-hour workday, and sit continuously for one hour; and push or pull a limited amount. (Tr. 1013). Dr. Nasir also found that plaintiff could never climb, balance, stoop, kneel, or crouch; and could only occasionally bend, reach, handle, finger, and feel. (Tr. 1014). As support for his findings, Dr. Nasir stated, "See medical records." (Id.).

Plaintiff saw Dr. Tomescu on January 31, 2011. (Tr. 746). Upon physical examination, plaintiff's gait was normal without use of assistive devices, and his exam was unchanged. (Id.). Dr. Tomescu continued plaintiff's medications. (Id.).

Plaintiff presented to Dr. Tomescu on April 28, 2011, with complaints of lower back pain and bilateral leg and feet pain. (Tr. 741). Upon examination, plaintiff had decreased pulsations in both lower extremities. (Tr. 742). Dr. Tomescu ordered a lower extremity arterial evaluation, which revealed lower leg edema. (Tr. 744). It was recommended that plaintiff undergo a repeat evaluation in eight to twelve months. (Id.).

Plaintiff presented to Dr. Tomescu on September 26, 2011, at which time he complained of numbness in both hands, lower back pain, neck pain, knee pain, poor vision, difficulty standing and walking, difficulty sitting, and left foot pain. (Tr. 738). Upon examination, Dr. Tomescu noted that plaintiff had an abnormal gait, used a cane for ambulation, and had limited range of motion in the lower back. (Tr. 737). Dr. Tomescu diagnosed plaintiff with type 2 diabetes, morbid obesity, COPD, degenerative disc disease of the lumbosacral spine, cervical disc disease, carpal tunnel syndrome,

diabetic neuropathy, controlled hypertension, and abnormal gait. (Id.). Dr. Tomescu prescribed Tramadol[33] and Lorcet. (Tr. 736). Dr. Tomescu stated that, "due to the multiple chronic conditions and the medications needed for treating them, I feel that Mr. Dunham is totally and permanently disabled." (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act through September 30, 2006.

2. The claimant is not fully credible in his allegations about the severity of his work-related limitations.

3. The claimant has not engaged in substantial gainful activity since the alleged onset date of disability.

4. Under the special technique for evaluating mental impairments, 20 C.F.R. §§ 404.1520a and 416.920a (2010), the claimant's depression does not precisely satisfy the diagnostic criteria of Part A of a listing. In addition, the claimant's mental impairment does not meet the Part B criteria. He has no limitations of activities of daily living; no limitations of social functioning; and slight limitations of concentration, persistence or pace. The claimant has no episodes of decompensation within one year, each lasting for at least two weeks. His mental impairment does not meet the Part C criteria.

5. The medical evidence establishes that the claimant has severe impairments of obesity, arthritis, and degenerative disc disease of the spine.

6. The claimant does not have an impairment or combination of impairments that meet or equal a listing.

7. The claimant has the maximum residual functional capacity to lift and carry no more than 10 pounds frequently and 20 pounds occasionally. The claimant can sit, stand, or walk for up to six hours each in an eight-hour workday. 20 C.F.R. §§

---

[33]Tramadol is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time. See PDR at 2429.

404.1545, 416.945 (2010).

8.    The claimant is unable to perform his past relevant work.

9.    Born on June 21, 1956, the claimant is currently an individual closely approaching advanced age. He has a tenth-grade, or limited, education. He has at least semi-skilled past relevant work experience. 20 C.F.R. §§ 404.1563, 404.1564, 404.1568, 416.963, 416.964, 416.968 (2010).

10.    Noting Rules 202.11 and 202.12, the claimant can perform jobs that exist in significant numbers in the national economy when his vocational factors and residual functional capacity are considered.

11.    The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision. 20 C.F.R. §§ 404.1520(g), 416.920(g) (2010).

(Tr. 770-71).

The ALJ's final decision reads as follows:

> It is the decision of the Administrative Law Judge that, based on the applications protectively filed on March 29, 2006, the claimant is not disabled for purposes of entitlement to a period of disability and disability insurance benefits and for purposes of eligibility for supplemental security income payments under the Social Security Act.

(Tr. 771).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.     The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).

To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants

with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard report entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See

20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

**C.     Plaintiff's Claims**

Plaintiff first argues that the Commissioner has largely ignored the district court's previous opinion.  Plaintiff next contends that the ALJ's residual functional capacity findings are not supported by substantial evidence.  Plaintiff also argues that the ALJ's reliance on the Medical-Vocational Guidelines is not supported by substantial evidence.  Plaintiff finally argues that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitations. The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility assessment.

**1.     Credibility Assessment**

Plaintiff argues that the ALJ should have given more weight to plaintiff's subjective complaints of pain and limitation.  Plaintiff acknowledges that the undersigned previously found that the ALJ's credibility determination was supported by substantial evidence.  Defendant contends that the ALJ considered similar factors again, and his credibility determination is supported by substantial evidence.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect

relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence. The ALJ properly pointed out Polaski factors and other inconsistencies in the record that detract from plaintiff's complaints of disabling pain. (Tr. 757-65).

The ALJ first discussed plaintiff's earnings record. (Tr. 757). The ALJ noted that, for all but five years, plaintiff's earnings were less than $10,000.00, and plaintiff never earned more than $12,000.00. (Id.). The ALJ stated that plaintiff's work history does not lend much credibility to his subjective allegations. (Id.). Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).

The ALJ next discussed plaintiff's daily activities. (Tr. 757). The ALJ pointed out that plaintiff occasionally plays guitar, cooks, shops, walks, and drives. (Tr. 757, 785, 115-22). The ALJ stated that these activities are not fully consistent with plaintiff's allegations of disability. Significant daily activities may be inconsistent with claims of disabling pain. See Haley v.

Massanari, 258 F.3d 742, 748 (8th Cir. 2001).

The ALJ acknowledged that plaintiff took a variety of medications for his conditions, including diabetes, pain, high blood pressure, and depression. (Tr. 757). The ALJ properly noted that this lends credibility to plaintiff's subjective allegations. (Id.). The ALJ also pointed out, however, that plaintiff's pain medications provided relief. (Tr. 764). Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999).

The ALJ then found that the objective medical evidence is not fully supportive of plaintiff's allegations of disability. (Tr. 757). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ discussed the medical evidence in detail and concluded that, while plaintiff sought regular treatment for his symptoms, for the most part treatment controlled his symptoms. (Tr. 764). The ALJ stated that examiners usually observed no signs indicative of plaintiff's allegations. (Id.). For example, the ALJ noted that examiners observed that plaintiff's gait, stance, and posture were essentially normal, especially beginning in April 2007. (Tr. 764, 993, 1026, 1022, 1030, 746).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's

complaints of disabling pain are sufficient, and his finding that plaintiff's complaints are not fully credible is supported by substantial evidence. Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 2.    **Residual Functional Capacity**

Plaintiff argues that the ALJ's determination that plaintiff is capable of performing light work is not supported by substantial evidence. Plaintiff contends that, because plaintiff does not have the RFC to perform the full range of light work, the ALJ erred in relying on the Medical-Vocational Guidelines at step five of the sequential analysis. Plaintiff further argues that, in finding that plaintiff was capable of performing light work and relying on the Medical-Vocational Guidelines, the ALJ ignored the district court's previous opinion.

As an initial matter, the undersigned notes that plaintiff argues in a footnote that the ALJ should have found that plaintiff's sleep apnea, mental impairments, and diabetes were severe impairments at step two. A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. Accord Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011); Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006). Conversely, "[a]n impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to work to do basic work activities." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." Id. at 708 (internal citations omitted).

The ALJ discussed these impairments and concluded that they were not severe. (Tr. 765-66). This determination is supported by substantial evidence. The ALJ noted that plaintiff did not

consistently report symptoms of diabetes to his physicians, and no examiner consistently noted signs of diabetic neuropathy. (Tr. 765). With regard to plaintiff's sleep apnea, the ALJ stated that this impairment improved with use of the CPAP machine, and there was no evidence of significant limitations due to sleep apnea. (Id.).

The ALJ also properly evaluated plaintiff's depression and found that it was non-severe. (Tr. 766). The ALJ found that plaintiff had no limitation in his daily activities related to depression, or limitations of social functioning. (Id.). The ALJ pointed out that examiners noted no difficulties in these areas. (Id.). The ALJ found that plaintiff had slight limitations of concentration, persistence, or pace. (Id.). The ALJ noted that plaintiff described some difficulty in this area, although he also shopped, read, and reported that he could follow written instructions. (Id.). Notably, when asked at the administrative hearing whether his mental impairments interfered with his daily activities, plaintiff was equivocal, stating "to a certain extent I guess." (Tr. 789). The ALJ properly found that plaintiff's depression was non-severe.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may

consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

In the first ALJ decision, it was determined that plaintiff was capable of performing the full range of light work. (Tr. 13). The undersigned found that the ALJ's RFC determination was not supported by substantial evidence, and noted that no physician had expressed an opinion on plaintiff's functional limitations. (Tr. 843). The undersigned stated that, based on Dr. Landry's findings alone, it was questionable whether plaintiff would be capable of performing the full range of light work. (Id.). It was also noted that the records of plaintiff's treating pain management physician, Dr. Nasir, did not support the ALJ's finding that plaintiff was capable of performing the full range of light work. (Tr. 844). The undersigned recommended that the matter be reversed and remanded to the ALJ in order for the ALJ to order additional medical information addressing plaintiff's ability to function in the workplace and formulate a new RFC for plaintiff based on the medical evidence in the record. (Tr. 845).

After remand, the ALJ again concluded that plaintiff was capable of performing the full range of light work. (Tr. 768). In support of his determination, the ALJ stated that the objective evidence as a whole shows that plaintiff can lift and carry ten pounds frequently and twenty pounds occasionally. (Tr. 767). The ALJ acknowledged that diagnostic imaging revealed "significant abnormalities of his spine," and that "a few examinations" revealed limited range of motion of the spine and joints, yet stated that no examiner found that plaintiff had significant upper extremity weakness. (Id.). The ALJ next found that plaintiff has no significant limitations in his ability to stand and walk. (Tr. 768). The ALJ stated that, although a few examinations revealed abnormalities of plaintiff's lower extremities and a few examinations revealed that

plaintiff limped, most examiners observed plaintiff had normal gait and stance. (Tr. 768). The ALJ found that plaintiff has no significant postural or manipulative limitations, noting that examiners failed to observe difficulties with postural activities and observed nothing significant about plaintiff's ability to use his hands and arms. (Id.). Finally, the ALJ stated that for long periods of time, plaintiff reported that medications were controlling his symptoms, and examinations revealed nothing significant. (Id.).

With regard to the opinions of treating physicians Drs. Nasir and Tomescu, the ALJ stated that he was assigning "neither controlling weight nor much deference because they are not well-supported by medically acceptable clinical and laboratory diagnostic techniques and are inconsistent with other substantial medical evidence in the case record." (Id.). The ALJ found that there were too many inconsistencies between Dr. Nasir's opinion and his treatment notes. (Id.). Specifically, the ALJ noted that one month before he completed the form, Dr. Nasir observed that plaintiff had a normal gait and balance, and he has not observed that plaintiff had any significant problems sitting. (Id.). The ALJ stated that there were similar inconsistencies between the opinion of Dr. Tomescu and her treatment notes. (Tr. 769). The ALJ noted that one month prior to completing the form, Dr. Scott found that plaintiff had full motor strength, and in August 2010, Dr. Tomescu found that plaintiff had no recognizable overt pathology of his neck, extremities, or musculoskeletal system. (Id.).

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord Halverson v.

Astrue, 600 F.3d 922, 929 (8th Cir. 2010); Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)). "'Moreover, an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence.'" Id. (quoting Prosch, 201 F.3d at 1014).

Title 20 C.F.R. § 416.927(d) lists six factors to be evaluated when weighing opinions of treating physicians: (1) the examining relationship; (2) the treatment relationship, including the length of the relationship, the frequency of examination, and the nature and extent of the relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. § 416.927(d)(1)-(6).

The undersigned finds that the ALJ erred in rejecting the opinions of plaintiff's treating physicians and formulating a residual functional capacity that was not supported by substantial evidence. Dr. Nasir, a pain management specialist, began treating plaintiff in March 2006. (Tr. 188-89). Plaintiff saw Dr. Nasir on approximately a monthly basis, except for a period in 2009 and 2010 during which he received his pain medication from his primary care physician. Plaintiff resumed monthly treatment with Dr. Nasir in July 2010. (Tr. 1023). In July 2010, plaintiff complained of chronic cervical back, bilateral shoulder, low back, and bilateral feet and knee pain.

(Id.). Upon examination, Dr. Nasir noted limited range of motion at the lumbar spine and cervical spine due to pain and obesity. (Id.). Plaintiff's gait and balance were normal. (Id.). Dr. Nasir diagnosed plaintiff with chronic mechanical cervical back pain, degenerative arthritis, chronic bilateral shoulder and knee pain, chronic bilateral foot pain, chronic low back pain, bilateral carpal tunnel syndrome, hypertension, diabetes mellitus, sleep apnea, depression, and obesity. (Id.). Dr. Nasir prescribed Hydrocodone. (Tr. 1024). On plaintiff's subsequent visits, Dr. Nasir noted that plaintiff's physical exam was unchanged. (Tr. 1020-22). He continued plaintiff's Hydrocodone and prescribed Ultram. (Id.).

Dr. Nasir completed a Medical Source Statement Physical on November 25, 2010, in which he expressed the opinion that plaintiff could frequently lift and carry less than ten pounds, and occasionally lift and carry ten pounds; stand or walk for a total of two to three hours in an eight-hour workday, and stand or walk continuously for zero hours; sit for a total of three to four hours in an eight-hour workday, and sit continuously for one hour; and push or pull a limited amount. (Tr. 1013). Dr. Nasir also found that plaintiff could never climb, balance, stoop, kneel, or crouch; and could only occasionally bend, reach, handle, finger, and feel. (Tr. 1014). As support for his findings, Dr. Nasir stated, "See medical records." (Id.).

As previously stated, the ALJ found that there were too many inconsistencies between Dr. Nasir's opinion and his treatment notes. (Tr. 768). The ALJ specifically pointed to Dr. Nasir's finding one month prior to providing his opinion that plaintiff had a normal gait and balance. (Id.). While Dr. Nasir did find in his most recent examinations that plaintiff's gait and balance were normal, he also found that plaintiff had limited range of motion at the lumbar spine and cervical spine due to pain and obesity. (Tr. 1023). Dr. Nasir prescribed narcotic pain medication

for plaintiff's complaints for an extended period of time.  Further, Dr. Nasir's opinion regarding plaintiff's work-related limitations was based on plaintiff's combination of many impairments.  Dr. Nasir, as plaintiff's long-term pain management physician, was in the position to provide a longitudinal perspective of plaintiff's impairments.  Thus, the fact that plaintiff's gait and balance may have been normal on some examinations is not inconsistent with the opinion that plaintiff was limited in his ability to work eight hours a day due to his combination of chronic mechanical cervical back pain, degenerative arthritis, chronic bilateral shoulder and knee pain, chronic bilateral foot pain, chronic low back pain, bilateral carpal tunnel syndrome, hypertension, diabetes mellitus, sleep apnea, depression, and obesity.

Dr. Tomescu was plaintiff's treating primary care physician at Steele Family Rural Health Clinic.[34]  On July 8, 2010, Dr. Tomescu diagnosed plaintiff with diabetes mellitus, back pain, bilateral knee osteoarthritis, and obesity, and prescribed Ultram, and Lorcet.  (Tr. 1001).  On August 5, 2010, plaintiff reported that his mid-thoracic pain was getting worse.  (Tr. 1003).  Upon examination, Dr. Tomescu noted that no overt pathology was recognized.  (Tr. 1004).  Dr. Tomescu prescribed a muscle relaxant.  (Id.).  On September 2, 2010, plaintiff reported that his back pain and neck pain were worse.  (Tr. 1006).  Dr. Tomescu did not examine plaintiff's back.  (Tr. 1007).  Dr. Tomescu completed a Medical Source Statement Physical on November 22, 2010, in which she expressed the opinion that plaintiff could occasionally lift and carry less than ten pounds; stand or walk for less than one hour; sit for less than one hour; and was unable to push or pull repetitively, due to diabetic neuropathy, carpal tunnel syndrome, severe cervical radiculopathy, severe L5 spine radiculopathy, and COPD/heart disease.  (Tr. 1036).  Dr. Tomescu

---

[34]While plaintiff had been receiving treatment at Steele Family Rural Health Clinic since 2002, it is unclear when he started seeing Dr. Tomescu.

also found that plaintiff could never balance, stoop, kneel, or crouch; and could only occasionally climb, bend, reach, handle, finger, feel, and see. (Tr. 1037). On September 26, 2011, plaintiff complained of numbness in both hands, lower back pain, neck pain, knee pain, poor vision, difficulty standing and walking, difficulty sitting, and left foot pain. (Tr. 738). Dr. Tomescu noted that plaintiff had an abnormal gait, used a cane for ambulation, and had limited range of motion in the lower back. (Tr. 737). Dr. Tomescu expressed the opinion that, due to plaintiff's multiple chronic conditions and the medications needed for treating them, he was totally and permanently disabled. (Tr. 736).

The ALJ found that Dr. Tomescu's opinion was inconsistent with her treatment notes, and pointed out that, in August 2010, Dr. Tomescu found that plaintiff had no recognizable overt pathology of his neck, extremities, or musculoskeletal system. (Tr. 769, 1004). It is true that Dr. Tomescu's treatment notes, while noting plaintiff's complaints of pain, do not provide many objective findings until September 2011, at which time Dr. Tomescu noted that plaintiff had an abnormal gait, used a cane for ambulation, and had limited range of motion in the lower back. (Tr. 737). The severity of plaintiff's musculoskeletal impairments, however, has been confirmed through an MRI of the cervical spine on November 9, 2010, which revealed multilevel degenerative disc disease with disc herniations and formainal stenosis at multiple levels. (Tr. 1032). While the ALJ refers to Dr. Scott's lack of findings on examination in discrediting Dr. Tomescu's opinion, Dr. Scott also found that plaintiff was not a surgical candidate because his "disease process [was] advanced to the point where [] the surgery will not benefit him." (Tr. 1032).

The ALJ erred in discrediting the opinions of plaintiff's treating physicians. Significantly,

Drs. Nasir and Tomescu were the only physicians who provided opinions regarding plaintiff's ability to work with his combination of impairments. The undersigned previously found that the ALJ's RFC determination was not supported by substantial evidence. The undersigned pointed to objective evidence which cast doubt on plaintiff's ability to perform the full range of light work. Upon remand, the ALJ had the benefit of opinions from plaintiff's treating physicians regarding plaintiff's work-related limitations. Neither of these opinions are consistent with the ability to perform light work.

The ALJ, however, again found that plaintiff had the RFC to perform the full range of light work. In making this determination, the ALJ focused on some normal objective findings on examination, while ignoring other objective findings that were supportive of plaintiff's claim. "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Ingram v. Chater, 107 F.3d 598, 604 (8th Cir. 1997). The only physicians to express an opinion regarding plaintiff's ability to work with his combination of impairments found that plaintiff had limitations inconsistent with the ability to perform the full range of light work. The objective medical evidence, specifically the significant MRI findings, are supportive of these opinions. Thus, the ALJ's RFC determination is not supported by substantial evidence in the record as a whole. Based on this erroneous residual functional capacity, the ALJ then applied the Medical-Vocational Guidelines and determined that plaintiff could perform other work existing in significant numbers in the national economy.

Ordinarily, when a denial of benefits is fund to be improper, the case is remanded to the ALJ out of deference. Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000). Reversal and an

immediate award of benefits is appropriate only where the record overwhelmingly supports a finding of disability. <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 947 (8th Cir. 2009). The court is mindful that this case has already been remanded once, and the ALJ again made errors in determining plaintiff's RFC. While the record does not support the ALJ's determination that plaintiff is capable of performing the full range of light work, it does not foreclose the possibility that plaintiff is capable of performing less than the full range of light work. Thus, it cannot be found that the record overwhelmingly supports a finding of disability.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to formulate a new residual functional capacity for plaintiff based on the medical evidence in the record and, if necessary, to adduce the testimony of a vocational expert to determine how plaintiff's non-exertional impairments restrict his ability to perform jobs in the national economy.

**RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this 11th day of January, 2013.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE